MEMORANDUM OF DECISION
On March 9, 1999, the petitioner, Kristine D. Ragaglia, Esq., Commissioner of the Department of Children and Families ("DCF"), filed a petition to terminate the parental rights of L.N., the mother, and J.S., the father, to their daughter Mariah S. Trial concerning the petition, as amended, took place on October 12, 13, 15, 20 and 27. For the reasons stated below, the court grants the petition to terminate parental rights.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
At age 12, L.N. became pregnant by J.S., then age 26. She is an African-American former foster child and was then living in Danbury, Connecticut, with her maternal grandmother, J.N. (who became her legal guardian when she was eleven), and two of her grandmother's adult children. Mariah was born to L.N. in September, 1995, when L.N. was thirteen years of age. At the time, L.N. was barely attending school. She was frightened of DCF, due to her own mother's experience in having children removed from her care.
A DCF social worker interviewed her in September, 1995, shortly after the baby's birth, and she reluctantly agreed to accept the services of the Intensive Family Preservation Service. L.N. then made poor caretaker choices for Mariah. Mariah was cared for by several individuals.
In November, 1995, during a home visit, DCF social worker Linda Nasser found that Mariah was not there and that L.N. could not provide, with certainty, the name of her babysitter. She stated that Mariah was returned to her care each day at 3:00 p. m. A visit to the babysitter's location revealed that the baby's caretaker had a different name than that provided by L.N. This caretaker stated that Mariah had been in her care without being returned to L.N. since two days previously. Two weeks later, an CT Page 14684 unannounced DCF visit revealed that no one in L.N.'s home knew where she or Mariah were and that they did not know how to locate L.N. In December, 1995, L.N. stated to Ms. Nasser that she was overwhelmed by caring for Mariah and wanted to have a friend care for her instead.
On January 11, 1996, DCF filed a neglect petition concerning Mariah. Later in the same month, Ms. Nasser visited a home in New Milford, Connecticut (the "O. family") where L.N. had placed Mariah to be cared for three weeks earlier. Thus, as of January, 1996, L.N. did not have daily contact with Mariah. In February, J.N. advised DCF that her family wanted to transfer legal guardianship of Mariah to the O. family. Later in February, 1996, the adult male occupant of this home was arrested for a drug-related offense. DCF then removed Mariah from the O. family home on February 29, 1996, invoking a 96-hour hold. On the next day, March 1, 1996, the Superior Court for Juvenile Matters (Leheny, J.) issued an Order of Temporary Custody ("OTC"), finding Mariah to be in immediate physical danger from surroundings and that removal was necessary to ensure her safety. Mariah was placed in foster care, where she has remained ever since. At the time of trial, she had been in foster care for over three and a half years; she herself became age four in September, 1999.
A court-ordered psychological evaluation by Dr. David Mantell of L.N. occurred in June, 1996. She appeared to the evaluator as "sullen, angry, and hostile at times with a quiet, firm oppositionality." Petitioner's Exh. 14, at 2. Given the low quality of L.N.' s responses, the evaluator felt it was pointless to continue administering verbal sub-tests. Id. at 3. The evaluator concluded that L.N. was "depressed," "socially and emotionally estranged, probably conduct disordered . . .," and that she presents "without any signs of insight, with feelings of pervasive loneliness, lack of constructive activity, and with very poor judgment." Id. at 4. He recommended mental health care, a psychiatric evaluation for assessment of depression and medication review, and an intensive program of individual psychotherapy. He also suspected "some genuine learning disabilities." Id. Unfortunately for L.N. and her child, Dr. Mantell's diagnosis of oppositionality, lack of insight, and poor judgment were conclusively confirmed by subsequent events.
In early 1997, Ms. Nasser of DCF addressed the Department's concerns about lack of follow-up to J.N., L.N.'s grandmother. As of April, 1997, DCF reported that, after her daughter was CT Page 14685 placed in foster care, L.N. was still not attending school with regularity and was missing scheduled visits with Mariah. Bonding between Mariah and L.N. was observed to be minimal and the baby was initially reluctant to go to her mother when visits occurred. This situation of minimal familiarity and reluctant contact at visits has continued to the time of trial.
In the spring of 1997, after Mariah had been in care for over a year and L.N. had made little progress toward reunification, DCF felt additional steps were needed. On April 10, 1997, L.N., J.N. (her grandmother/guardian), and Ms. Nasser of DCF entered into a Service Agreement, Pet. Exh. 3, the purpose of which was to outline the responsibilities that L.N. and DCF would have "in creating the conditions that would allow [L.N.] to be considered as a permanent caretaker for Mariah. . . ." In this agreement, besides agreeing to visit Mariah, L.N. agreed to participate in psychotherapy and to show improvement in various areas, including: "judgment, relationships with men, self-esteem and parenting issues (realities of child care responsibilities and child's needs)." She also agreed to a psychiatric evaluation. She acknowledged that DCF had referred her to various service providers and agreed to let DCF know if the services were unavailable so that alternative resources could be offered. DCF agreed to offer such alternatives. Id. Weekly visits were to occur; they were a starting point on which to build. A six months review was planned. Id. L.N. refused to participate in psychotherapy or to complete a psychiatric evaluation. She did not begin counseling with a psychologist, until January, 1999, twenty-one months later.
On March 18, 1998, after Mariah had been in foster care for two years, and after a nolo contendere plea by L.N., Mariah was adjudicated as neglected by the court (Resha, J.) and her custody was committed to DCF for a period up to twelve months. On that date, L.N., her attorney, her court-appointed guardian-ad litem, and the child's attorney executed and the court ordered Expectations including that L.N. was (1) keep all appointments set by or with DCF; (2) keep her whereabouts known; (3) visit the child as often as DCF permits; (4) engage in individual counseling; (5) secure/maintain adequate housing and income;[2]
(6) engage in no substance abuse; (7) obtain a consistent secondary caretaker; (8) have no involvement with criminal justice system; (9) participate in a teen mentor program; and (10) complete psychological evaluation and follow recommendations. These Expectations were similar in many respects CT Page 14686 to L.N.'s responsibilities under the April, 1997 service agreement, which had been agreed to almost one year earlier. The Expectations specifically advised L.N. in a Notice to Parents that "Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker." At that time it was clear to all what needed to be done to consider returning the child to her mother.
Nearly one year later, on March 9, 1999, the petition to terminate parental rights was filed. On March 16, 1999, the court (Resha, J.) extended the commitment for another twelve month period. Two weeks later, on March 30, 1999, J.S. consented to the termination of his parental rights before the court (Resha, J.). On August 9, 1999, the petitioner moved to amend the petition; this motion was granted by the court on September 15, 1999.
B. Mariah and Her Progress in Foster Care
Mariah, now age four, is of bi-racial heritage. After the OTC was issued, Mariah was placed initially with M.P., a Caucasian parent and grandparent who has been a foster parent for 31 years. For the last 8 years she has cared for medically fragile children. Mariah lived with her in a two parent household which, due to an extended family, involved a house full of children. M. P.'s family is a blended family. One of her adopted children is of Puerto Rican descent, another has a Jamaican, French, and Peruvian background.
Mariah has thrived in foster care. Witness after witness described her as a highly intelligent, creative child. Soon after placement, Mariah became very comfortable in M.P.'s home.
In July, 1998, after Mariah had been with M.P. for two years and five months, DCF began to seek an adoptive home for Mariah; M.P. informed DCF that her daughter Beth, who lives nearby, might be interested in adoption. Beth (who is Caucasian) and Mariah had felt an early affinity for one another, but Beth separated herself from Mariah because she knew Mariah was a child she could not have. A gradual transition resulted in Mariah living with Beth. Ms. Aleta Markham, a DCF social worker, observed their good interaction together. This placement involved continuity for Mariah as she remained within a close-knit, CT Page 14687 extended family. When she first lived with Beth, Mariah referred to her new foster mother as "Beth." She now refers to her as "Mommy."
Both M.P. and Beth testified at trial. M.P. described that she met L.N. in March, 1996, when weekly visits with Mariah were first scheduled at M.P.'s home. L.N. was not comfortable with Mariah; she spent five or ten minutes holding her and then returned her to M.P.'s care. L.N. never changed a diaper or gave the baby a full feeding. M.P. gave her parenting advice, including suggestions for caring for the child, but L.N. did not progress. Mariah picked up on L.N.'s discomfort. Initially, for the first year and a half when L.N. called herself "Mommy" Mariah would do so also. More recently she calls her "Tisha." She has not called her "Mommy" for a long time.
L.N.'s second mentor came to visits with her and did an excellent job in encouraging L.N. to be a parent. Often they took Mariah out of M.P.'s house for visits so that L.N. would have the opportunity to visit outside the home. This mentor, Robin Murphy, found M.P. to be welcoming and friendly.
M.P.'s family consisted of six "birth" children and four adopted children, five of whom live nearby to where she resides in New Milford (two children are deceased.) She also has several grandchildren. Mariah has contact with this extended family six or seven days a week. Mariah sees M.P.'s daughters and their husbands as her aunts and uncles.
M.P. touchingly described how, after M.P. recently had surgery, Mariah did her best to help her foster grandmother get things and tried, at age four, to help her walk.
When L.N. misses scheduled visits to Mariah, Mariah has no reaction. She has stated that she does not wish L.N. to visit. Exh. 1 at 10. In contrast, Mariah sees Beth as her mother and is very affectionate with her. She tells Beth how much she loves her. M.P. also noted that Mariah is a strong-willed child who needs parental direction.
Beth also testified concerning her relationship with Mariah, who has now lived with her for one year and three months. She said, "we are mother and daughter." She also has a 10 year old son, with whom Mariah is close. She noted Mariah's almost daily contact with her extended family. Currently, Mariah is in CT Page 14688 pre-school and participates in a variety of activities. Beth has expressed the desire to adopt Mariah. Exh. 1 at 20.
The court finds both M.P. and Beth to be credible. They appear to be mature and stable parents who have established a substantial grandparent and parental bond with Mariah.
C. The Mother
1. Assessments
Various witnesses provided assessments of L.N. Dr. Mantell, a psychologist, as a court-appointed evaluator, re-evaluated her in 1999 and testified at trial concerning his reports. Exhibits 12, 14, and C. The following portions of his 1999 "Summary" are particularly significant to the court. He observed that "[s]he reflects little insight into her own past and into the difficulties that led to the placement of the child outside her care." Exhibit 12 at 6. He added that "[s]he continues to evidence difficulties with social and emotional growth and appears to broadly continue in a dependent position in her grandmother's home where she feels most comfortable." Id. While he noted that she evidenced "general growth" since he saw her in 1996, he still found her to be "a relatively immature, dependent, and lonely person with strongly avoidant social features." Dr. Mantell could not make recommendations concerning the child living with the mother since he had no opportunity to observe them together.[3] He believes that L.N. has a sufficient overall I.Q. to parent a child and that she is "workable."
He cautioned that one had to distinguish between her improved condition and caring for a particular child. He noted at trial that, typically, where a four year-old child has been in foster care for three and one-half years, continuity of attachment is fundamental for the child's well-being. In such a situation, he believed disruption of that attachment would cause major trauma to a child who has bonded with his/her caretakers, resulting in loss of developmental competency and potential emotional disturbance. He noted that "time is of the essence" for a permanency plan for a very young child. Multiple placements for such a child can result in "reactive attachment disorder," a situation where deep attachments are not formed.
L.N. also presented her current counselor, Dr. Leonard Sucholiff, a psychologist. Beginning in January, 1999, L.N. saw CT Page 14689 him for counseling, mostly with her grandmother, seventeen times in sessions of 30-40 minutes each. He believes that L.N. is of above average intelligence. He has "scarce" knowledge of Mariah, but offered the opinions that L.N. can assume a responsible position in the life of her child and that there was nothing he knew to preclude L.N. from being a custodial parent for Mariah. The court does not credit this view, since it lacks foundation, for the reasons stated below.
This witness had absolutely no knowledge of Mariah as an individual, except for what he termed as "scarce" information provided by L.N. Dr. Sucholiff's treatment plan for L.N. included helping to support her in trying to gain custody of her daughter. The goals involved dealing with DCF, dealing with L. N.'s medical condition (she was hospitalized for a week due to blood clots in April, 1999), and dealing with the emotional strain of the termination of parental rights process. He learned almost nothing about L.N.'s role as a caretaker for Mariah or why Mariah was removed from her. He did not delve into the background of what led up to L.N.'s situation in early 1999; his focus was on helping her through her current struggle. He lacked knowledge of key facts; for example, he was told L.N. had missed one-half of the visits to Mariah. In fact, in 1998, immediately before he started seeing her, L.N. had gone to visit 10 out of a total of 51 possible times. He was also not aware that she had not completed the psychiatric assessment which was required of her. It is evident to the court that L.N. was not completely honest with her counselor.
It is clear from Dr. Sucholiff's testimony that L.N. still does not take good advice. He recommended that she return to school or get a G.E.D., but she has not pursued further education.[4]
2. Testimony By Respondent Mother
L.N. and J.N. contradicted each other and the undisputed weekly records kept by M.P. concerning visitation. J.N. testified that, starting in September, 1998, she took L.N. by car on a regular basis to visit Mariah. This simply did not occur. Regular visits finally began several months later, in late January, 1999. She claimed to have visited at every opportunity in October, 1998 and December, 1998. The clear record shows this not to be true, as no visits occurred in October or December, 1998. L.N. testified she had visited regularly since April, CT Page 14690 1998. This was also inaccurate.
L.N. complained at trial that she had been offered no services in her home prior to Mariah's removal. Currently, she is working at a nursery school. Her plan is to have Mariah return home to live with L.N. and J.N. She would be able to bring Mariah to the nursery school where she works. She would not plan to abruptly take Mariah from her foster family; saying they could visit and send cards and letters.
She acknowledged in her testimony that she did not think about the consequences to Mariah when she stopped seeing her for significant periods of time. She conceded that only at the end of 1998 did she recognize that her failure to visit was diminishing her chances to develop a relationship with Mariah. When Mariah did not talk to her much, she finally realized it was because she had not been there for a while. She also conceded that Mariah recognizes M.P. and Beth and their family members as "her family." The court finds that she is nearly oblivious to the negative impact that a move away from Beth's and M.P.'s family would have on Mariah.
D. Reunification and Rehabilitation
1. Visitation
L.N. was immediately afforded visitation in March, 1996 at the foster family's home in New Milford, Connecticut, the same neighboring town where she had placed the child in the care of friends earlier that year. L.N. testified that the foster grandmother's home was located about thirty minutes from her own home. According to Ms. Markham, a DCF social worker, the distance by car was forty minutes. To the court, the difference is insignificant.
Initially, Ms. Markham explained the need for L.N. to keep the weekly appointments to visit the child. Ms. Nasser emphasized this also.
Over time, L.N.'s visits to Mariah became very limited, and, for significant periods, nonexistent. In 1997, she visited 30 out of 51 times. In 1998, she visited only 10 out of 51 opportunities. L.N. did not inquire concerning Mariah's health after periods when she did not visit. CT Page 14691
Initially, it was anticipated that her aunt would transport her to visits every other week. In June, 1997, DCF located a social services assistant who could drive L.N. to her appointment for visits, with the result being that she would have a ride every week (provided her aunt and by DCF). In late June, 1997, L.N. reported that she had solved the problem herself and had no need for transportation to visits.
In August, 1997, L.N. canceled a visit due to lack of available transportation. She sought increased visitation. At this point, a social services assistant was no longer available to drive L.N. to the visits.
For a period of several months, from August, 1997 to mid-January, 1998 her teen mentor, Robin Murphy, now a DCF social worker, was able to transport her just about every week. During these visits, she and L.N. took Mariah to parks, libraries, and out for food. These visits lasted about two hours. Ms. Murphy observed an attachment then between L.N. and Mariah. Due to Mariah's confusion, M.P. asked her to have L.N. refer to herself as "Tisha." When Ms. Murphy became a DCF employee, she had to stop being L.N.'s mentor.
As an alternative, DCF proposed that L.N. go by bus from Danbury to New Milford for the visits. A DCF staff member would go with her on the bus initially to show her the directions to the foster home. The bus went hourly to New Milford and would take her within a seven to eight minute walk of two-tenths of a mile to the foster home. This alternative was discussed more than once. L.N. consistently refused to take public transportation. Ms. Markham also discussed with L.N.'s teen mentor the need to use public transportation.
At trial, Ms. Murphy expressed concern about L.N. having to travel by bus since she thought it required a considerable walk down Rte. 202, which she thought was unsafe. When it was pointed out that the bus stopped at a place which involved merely crossing the road and not an extensive walk on Rte. 202, she expressed confusion about the route and location. She agreed that a ten minute walk was not burdensome. The court does not credit her testimony about safety, since it was shown to be based on a mistaken premise.
Tellingly, L.N. herself testified that if she had known that the bus stopped near a bank and not at another spot, she would CT Page 14692 have taken the bus to visits. Obviously, if she had agreed to be accompanied by a DCF employee on the bus route, as recommended, she would have learned this years ago. Her own refusal to cooperate cost her (and her child) the opportunity to visit.[5]
In November, 1997, Ms. Markham advised L.N. by letter (Exh. 19) that she could be reimbursed for mileage incurred in visiting. It was noted that she could pick up Mariah at the foster home, and take her out, unless Mariah was "very distressed about going out with you. . . ."
After the March, 1998 neglect commitment, and the entry of the court's Expectations, L.N.' s willingness to cooperate went further downhill. Months went by when Ms. Markham attempted to reach L.N. concerning visitations and compliance with the Expectations but received no return phone calls. It became even more difficult to engage L.N. and to get her to respond.
When she was unsuccessful in phone contact, Ms. Markham sent another letter, dated April 16, 1998 to again offer DCF's help with visitation. Exh. 21. At that time, Mariah was two and one-half years old. In 1997 and 1998, long breaks in visitation ensued. In May, 1998, Ms. Markham again communicated her concerns in writing. Exh. 22, a May 12, 1998 letter (which has also copied to L.N.'s guardian ad litem) again raised the issues of visitation, the Expectations, and noted, "[i]n order for Mariah to be returned, it is important that you take the Expectations seriously." L.N. signed a return receipt request acknowledging her receipt of this letter. At that time, DCF transportation was available. She could have been driven to visits. A follow-up letter on May 18, 1998 (Exh. 23) raised the same points. L.N. still did not improve her level of cooperation or willingness to visit the child. When L.N. finally did contact DCF, no driving transportation was available since there had been no earlier response and the resources were used elsewhere.
Ms. Markham then started to discuss with L.N. the possibility of a termination of her parental rights. She was informed that DCF would start to look for a legal risk/pre-adoptive home for Mariah. L.N. did not seem upset. She was advised of the potential consequences of not doing what was required.
Visitation was addressed yet again in DCF's July 22, 1998 notification to L.N. (again copied to her guardian ad litem) that Mariah was being placed in a "legal risk adoptive home." CT Page 14693 Exh. AA. Ms. Markham wrote, "If you would like to set up visitation I'll try my best to get transportation for you." Clearly, by this point visitation was non-existent.
On December 3, 1998, Ms. Markham went to see L.N. and advised her that DCF was planning to file to terminate her parental rights since there had been no meaningful compliance with significant parts of the Expectations. Ms. Markham noted that there had been few visits from the time of commitment (March, 1998) to the meeting (December, 1998), a period of approximately nine months. At this time Mariah was approximately three years and three months old. L.N.'s response was that she had been "working", and she was still not willing to take public transportation. To that point, she had never offered any explanation as to why not. She never expressed any safety concern. In late January, 1999, L.N. began to visit Mariah regularly.
D. 2. Psychological Evaluation and Counseling
Critical to the possibility of reunification was L.N.'s own psychological condition. Psychotherapy was recommended in June, 1996 after Dr. Mantell's evaluation, but she flatly and firmly rejected it. In spite of the urging of her DCF social workers and her grandmother (her legal guardian), by this poor judgment, she deprived herself (and her child) of the opportunity to gain some insight into herself which in turn, might have permitted her to be able to relate to Mariah in a way that established a meaningful mother-daughter relationship.
The refusal to engage in individual therapy occurred from the beginning. As her DCF social worker, Ms. Markham testified, L. N.'s problems with judgment, with relating to her child, and with the Department, all needed to be addressed. Counseling was important for life planning. She had little insight into parenting requirements. The importance of therapy was explained to her.
Based on Dr. Mantell's June, 1996 report, DCF also referred L.N. to Dr. Gelinas, at Danbury Hospital, for a psychiatric evaluation. Ms. Markham reviewed with L.N. its importance, noting that it would be hard for L.N. to do well if she was depressed. She offered phone numbers and was willing to suggest alternatives. A psychiatric examination was begun but L.N. did not return to complete it. Follow-up treatment was available, but CT Page 14694 L.N. never sought to utilize it.
L.N. continued to resist counseling. She advised Ms. Markham that she would not go to counseling if DCF was recommending that Mariah be placed in DCF's custody for up to twelve months. Subsequent to the March, 1998 neglect adjudication, Ms. Markham communicated in writing in April, 1998 when she could not reach L.N. by phone, again emphasizing the need for individual counseling. Exh. 21. In May, 1998, she sent Exh. No. 23, which indicated a new evaluation by Dr. Mantell had been scheduled. This evaluation, scheduled for June 15, 1998, did not occur, since L.N. failed to appear. Exh. 1 at 12. Dr. Mantell did not evaluate her again until September, 1999. Exh. 12. In July, 1998, she was advised that Mariah was being placed in a Legal Risk Adoptive Home. Exh. AA. Even then she could not move herself to act for her own benefit.
Despite the fact that she agreed to counseling in the April, 1997 Services Agreement (Exh. 3), and the March, 1998 Expectations (Exh. 5), and the fact that she knew in July, 1998 that her child was being placed in a pre-adoptive home, she still refused to accept counseling until December, 1998, after her DCF social worker told her that, except for having a teen mentor, L. N. had not complied with the Expectations. Finally, L.N. began seeing Dr. Sucholiff in January, 1999.
D. 3. Other Expectation Issues
L.N. did comply with certain of the court's Expectations, but not with others. She kept DCF advised of her whereabouts and she did not engage in substance abuse. She secured various jobs and her housing with her grandmother/guardian was adequate. She participated in the teen mentor program. She did not get involved in the criminal justice system.
The requirement that L.N. keep all appointments with DCF was not met. She did not attend two case reviews at DCF, on July 14, 1998 and January 12, 1999, which were scheduled to discuss planning for Mariah.
Prior to the filing of the petition, L.N. did not identify an alternative proposed caretaker for L.N. Her maternal grandmother/legal guardian never sought to intervene in the proceedings or to present herself as an alternative resource. In her testimony, she acknowledged that she was busy working and was CT Page 14695 recently retired due to a disability. Her testimony reflected an inability to supervise L.N., let alone L.N. and Mariah also. The court finds that she was unable to provide much guidance to L.N., and that L.N. certainly did not heed her advice to stay away from J.S. L.N. herself acknowledged that she declined to follow her guardian's advice. At trial, L.N. indicated that J. N. was now available to help take care of Mariah.
Observations of Interactions With Mariah
Dr. Martinez
Dr. Diana Martinez, a psychologist, observed interactions between Mariah and her mother, L.N., on three separate occasions, in March, 1999 and in August, 1999. She prepared reports concerning each (Exhs. 16, 17, and 18). The first occurred in March, 1999, when she was requested by DCF to observe a visit at the M.P.'s, the foster grandmother's home, as it was reported that Mariah evidenced distress, would cry, and be withdrawn when her mother visited. This had followed a January, 1999 visit with L.N. and J.N. at which Mariah was allegedly informed that she would be living with them, causing her to be distressed. This observation occurred after L.N. resumed visiting Mariah after long hiatuses between March and December, 1998.
At the March, 1999 visit, L.N. "minimally" interacted with Mariah and passively observed the environment; Mariah was resistant to referring to L.N. by name or even to talk to her. In contrast, she referred to M.P. as "grandmother." Exh. 16, at 2. Mariah was observed to have "a very active imagination and command of the language." Id. At trial, Dr. Martinez noted that Mariah has a tremendous vocabulary, and very good expressive skills. Mariah appears to be of above average intelligence. In her report, Dr. Martinez observed that L.N. "does not demonstrate active caretaking or interest, rather remains passive," and that she did "not know how to engage, stimulate Mariah's active imagination or recognize the value of interacting with Maria to promote the relationship. " Id. In summary, she noted that the "child's bonding is not with the biological mother." Id. She noted at trial that L.N. did not bring activities that were age-appropriate for Mariah or know how to proactively meet the child where she was at. Mariah was seen as a child with a lot of potential if channeled in the right direction. L.N. was seen as one who could not become an active CT Page 14696 participant with Mariah in her activities. Mariah demonstrated a sense of guardedness and vigilance around L.N. There was not an affective link of comfort, security, and trust which are all aspects of attachment. L.N. had no mental plan as to how to connect with the child.
Exh. 17 reflected Dr. Martinez' observation of visits between L.N. and Mariah held at the DCF office in Danbury on August 18 and 25, 1999. An interest had been expressed in observation in a neutral" setting, i.e. not at the home of the foster grandmother. There, observation occurred through a one-way mirror. At the August 18 visit, Mariah initially resisted entering the room and remaining alone with L.N. L.N. was sensitive to this and did not do anything negative during the visits. Mariah's foster grandmother, M.P., remained briefly, and reassured Mariah by saying she would leave, but would return since she was leaving her pocketbook behind. Exh. 17 at 2. Again, although she brought books to the visit in order to read to Mariah, L.N. was generally passive while enjoying being with the child. Id. In contrast, one week later on August 25, Mariah was very resistive to remaining alone with L.N. She clung to her foster grandmother and stood between heir and the door "as if to impede her from leaving." Id. Eventually, Mariah was on the foster grandmother's lap and did not want to get off. Thirty minutes into the session, Mariah said, "I want to go home." Id. At this visit, L.N. had "no sense of what to do. . . ." There was "minimal eye contact between Mariah and L.N." Id.
At trial, Dr. Martinez noted that, initially, Mariah did not display any recognition of L.N. as she entered for the visit. Clearly, Mariah felt safe with her foster grandmother; she remained guarded around L.N.
Dr. Martinez noted that Mariah has just turned four. At this stage of life permanency in a child's life is extremely important. Some children who suffer attachment break-ups turn out to have difficulties in adolescence and in their later personal relationships; some become violent and have difficulties in making attachments and developing interpersonal trust. To break Mariah's attachments would certainly have a negative impact on her, causing an anxiety reaction.
Dr. Martinez also observed an interaction between Beth, Mariah's foster mother (who is a daughter of the foster grandmother), and Mariah at the foster grandmother's home three CT Page 14697 weeks later, on September 14, 1999. The contrast between this interaction and those of L.N. and Mariah was vivid. Mariah referred to Beth as "Mom." Beth and she engaged in frequent conversation. While playing with the child, Beth appropriately incorporated behavioral expectations and instructions. Exh. 18 at 2. On occasion, when Beth got up, Mariah expressed concern that Beth would be leaving for work and encouraged her to remain. In this session, although the foster grandmother left the visiting area, Mariah expressed no anxiety about this. She was content to play with her foster mother. In summary, Dr. Martinez noted that Mariah "demonstrates familiarity, comfort and attachment with her foster mother." Id. Beth was observed to reciprocate, while maintaining an authority role. Id.
Dr. Martinez also noted that, in order for Mariah to continue to grow, she would need to be in a setting where she was with people who were equally verbal and focused on education. If not, she may stop developing or regress. Dr. Martinez also believes that Mariah may benefit from having some relationship with L.N., but this should be established on a very gradual basis without disrupting the opportunities she would have with regard to education and the stimulating home environment she would have as a member of Beth's and M.P.'s extended family. It is very important for Mariah's future stability to have a permanent plan in place now. Dr. Martinez believes it would be in Mariah's best interest to allow her foster mother to adopt her. From her observations, L.N. does not know how to engage and stimulate Mariah.
With regard to L.N.'s existing relationship to Mariah, Dr. Martinez found it to be, from Mariah's point of view, similar to relating to a stranger. While L.N. could conceivably meet Mariah's physical needs, Dr. Martinez did not believe she will know how to stimulate Mariah intellectually and emotionally, notwithstanding that L.N. herself may have the capacity to grow and to work on being better able to meet Mariah's needs.
Dr. Rosado
At the respondent mother's (L.N.'s) attorney's request, the court appointed Dr. Rodolfo Rosado, another psychologist, to evaluate L.N. and to observe interactions between L.N. and Mariah. Unsurprisingly, his observations bore several similarities to those of Dr. Mantell and Dr. Martinez. CT Page 14698
Like Dr. Mantell, he administered various psychological tests of L.N. As in Dr. Mantell's 1996 evaluation, Dr. Rosado's September-October, 1999 evaluation also discerned a possible learning disability. In his Psychological Evaluation, Exh. B, at 6, he noted that her language based skills were significantly below average, while in general intelligence she was "likely average." Her academic achievement scores "all fell within the low average to borderline ranges, when compared to adolescents her age." Id. Dr. Rosado also reported that, according to L.N., she has "relinquished her defiant stance, and acquiesced to the expectations that were mandated by DCF and the courts." Id. at 8. As an explanation for L.N.'s refusal to go to counseling, Dr. Rosado noted at trial that people of color are less likely to use professional psychological and psychiatric services as a result of having been the victims of discrimination.
Further, he noted "[L.N.'s] tendency to view many situations in a concrete manner (with less value placed on insight and thoughtfulness) is correlated with her intellectual abilities (where there were inconsistencies with abilities ranging between the Average to Borderline to Mildly Mentally Deficient levels)." Id. at 9.
Perhaps most significant, concerning her parental role, Dr. Rosado wrote,
 She recognizes the importance of love and attention to the needs of children. She also anticipates much joy in seeing and contributing to their positive growth. These are clearly strengths. But, there were elements in [L.N.'s] description that reflected both a lack of experience as well as a naivete. Parenting is certainly a positive experience, filled with love and endless rewards. But, it is believed that [L.N.'s] expectations do not fully prepare her for the challenges inherent in parenting, and it is completely unclear how she would face the conventional dilemmas and aggravations.
Id. at 9.
Dr. Rosado twice observed L.N. and Mariah together. He, too, commented that Mariah is "in both interpersonal psychological skills and in language skills. She is "exceptionally bright." By accident, after the first session, Dr. Rosado spent two additional hours observing Mariah on the courthouse steps and found that she continued to be playful and adaptive. He found her CT Page 14699 ability to be positive for the entire time "incredibly unusual."
His reports of the interactions had similarities to those of Dr. Martinez. Initially, at the first visit he observed, L.N., Mariah, and M.P., her foster grandmother, were present. Mariah did not want to separate from the foster grandmother and became anxious and increasingly distressed. Family Evaluation, Exh. B at 1. She remained relaxed and playful as long as she had the security of her foster grandmother's presence. While L.N. behaved appropriately and she and Mariah "related well," Dr. Rosado observed "an inadequate parent-child attachment between Mariah and her mother." Id. at 2. This was so even though there was "affection" between them. Transcript of testimony, at 82. L. N. is not a person to whom Mariah has a secure attachment. Rather, it seemed as though they did not have an attachment relationship.
After the session, Mariah played well with Dr. Rosado, "who was still a stranger to her." Exh. B at 3. It is clear to the court that Mariah, as long as she has the comforting presence of her foster family, will play appropriately with "strangers," such as Dr. Rosado and her mother, L.N.
Once again, in the second observation, Mariah refused to be separated from her foster grandmother (M.P.), to whom Dr. Rosado observed she has a strong attachment. Id at 3. When M.P. discretely left the room, Mariah began to check every ten minutes to make sure she was still there.
Having made progress, Dr. Rosado believes that L.N. is not depressed. In his report, he expressed doubt about her prognosis, saying, "there is a question about [L.N.'s] ability to sustain these changes and exhibit further growth." Id. at 7. At trial, Dr. Rosado moderated these views, saying she had a "favorable prognosis." He saw no reason why she could not be a parent.
Unfortunately, Dr. Rosado, like Dr. Sucholiff, also was given a skewed view of the underlying facts concerning visitation. For example, he was under the impression that all visits of L.N. with Mariah occurred in the foster home. This led him to erroneously believe that L.N. never had the opportunity to visit in a neutral setting. Transcript of testimony, at 16-17. In fact, L.N. and her mentor, Robin Murphy, took Mariah out of the house for visits for the period August, 1997 January, 1998. Also, he was not accurately informed about the sheer number of visits CT Page 14700 which L.N. simply did not attend. When queried on this, he said only that she "mentioned that she missed some recently because of her illness." Id. at 49. Clearly, he was not informed by L.N. of the significant gaps in visitation that had occurred. He agreed that a break in visitation for nearly a year would definitely affect the kind of relationship L.N. and Mariah had. Such a break for a pre-school child:
 causes there to be absolutely no opportunity to develop a potential attachment relationship with the parent and that a child by virtue of their day-to-day needs will have to develop an attachment, a primary attachment to whoever their primary caregiver is.
Id. at 50. He also noted one factor in any visitation progression, i.e. to more frequent or longer visits, ought to be the parent's willingness to attend scheduled visits. Without it, there is no opportunity to consider such a progression. Id. at 77.
His conclusion that there is no meaningful bond between L.N. and Mariah echoed that of Dr. Martinez. In response to the court, Dr. Rosado stated that he "did not see any behaviors or indications that Mariah related to [L.N.] as a unique person that qualified as a kind of bonded or secure attachment." Id. at 78. Dr. Rosado did not evaluate Mariah and said he could not predict how L.N.'s being a custodial parent to Mariah would affect Mariah. Id. at 85-86.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show, by clear and convincing evidence, that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent. . . ." Gen. Gen. Stat. § 17a-112 (c)(1). The statute does not define the term "reasonable." Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2d Ed.).State v. Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination. of parental rights context, the Appellate Court stated that "reasonable efforts means doing everything reasonable, not everything possible." In re JessicaCT Page 14701B., 50 Conn. App. 554, 566 (1998).
The evidence in this case is clear and convincing that DCF made reasonable efforts to reunify L.N. with her child after the issuance of the OTC in March, 1996. The record reflects that DCF offered or facilitated psychological evaluations, psychiatric evaluation, the teen mentor program, individual therapy, weekly visitation, and transportation to visits. DCF continued these efforts after the prompt, and accurate psychological assessment of L.N. provided by Dr. Mantell in June, 1996. Although he recommended a psychiatric evaluation and L.N. belatedly finally began it, she did not complete it or avail herself of the follow-up counseling which was available to her. By her own admission, L.N. refused to cooperate over a period of years. The court rejects, as inadequate, her excuse for this, to the effect that, at a previous counseling interview, an unnamed counselor told her she would end up like her mother. Being a parent requires one to deal with responsibilities. Counseling was recommended, then required. Apparently none of her advisors could convince her to go.
She does appear to have benefitted [benefited] from her recent counseling, begun in 1999 with Dr. Sucholiff. If she had availed herself of the recommended counseling promptly in 1996, and pursued it, she might have progressed sufficiently in terms of maturity in 1997, or even in 1998, to have been able to develop a real parental relationship with Mariah. That she did not engage in counseling of any kind until 1999, when it was too late, is not DCF's fault.
At trial, her counsel argued that the amount of visits were inadequate and that they should have been held in Danbury, away from the foster home where Mariah lived. Further, the claim was made that transportation should have been provided and the proposed bus ride was too long and/or unsafe. It was noted that, frequently, no car was available to her, due to economic circumstances, and that she was too young to drive herself. Her counsel also argued that an African-American young woman could be harassed when visiting a predominately Caucasian community as an explanation for reluctance to take public transportation to visit.
The court is unpersuaded by these arguments. DCF provided reasonable weekly opportunities for L.N. to visit Mariah. The visits were promptly set up to occur every Wednesday, and M.P. CT Page 14702 was willing to re-schedule them to other days for L.N.'s convenience.
The visitations reasonably occurred at M.P.'s home, from which L.N. was permitted to take Mariah out for several months. At different points, DCF offered transportation to visits, which was not accepted. These weekly visits were to have been the starting point; if sufficient progress had been observed between parent and child, more visitation would have occurred. Unfortunately, for long periods L.N. chose not to visit. To Mariah, L.N. became a stranger. DCF did not prevent L.N. from visiting Mariah.
The proposed bus trip to visit Mariah was not onerous or unreasonable. No meaningful evidence was offered to show that it was unsafe or that any incident of harassment occurred when she did visit or when she took Mariah out with her mentor. Most significant, L.N. herself admitted at trial that if she had known where the bus stopped, she would have taken it. Unfortunately, her own oppositionality prevented her from acquiring that knowledge. Being a parent often means having to do things, for the benefit of one's child, that one would prefer not to do. At the crucial times, L.N. did not recognize this.
The court also notes that L.N.'s effort to challenge the amount, location, and transportation arrangements surrounding visitation is belated. Testimony showed that L.N. attended only three of the eight treatment reviews which were held by DCF every six months concerning Mariah. She was represented by counsel, and had a guardian ad litem and a legal guardian from the inception of this matter in 1996. If the plans developed for Mariah, including visitation, had been unsatisfactory, they could have been challenged and relief sought in the administrative process before DCF and then in court. No such challenges were mounted.[6]
The evidence shows that between March, 1998, when the neglect adjudication occurred, and December, 1998, a ten month period beginning when Mariah was two and one-half years old, L.N. visited her six times. In October, November, and December, 1998, L.N. visited her once. If there ever was any meaningful bond between them, L.N. broke it in that year by ignoring her child's needs.
It is indeed tragic for L.N. that she became pregnant and CT Page 14703 had a child when she herself was a child. It is doubly tragic that she could not make herself begin to take a constructive approach to the situation until January, 1999, when she finally began counseling and chose to begin regular visits again, almost three years after Mariah had been placed in foster care. Those facts were not of DCF's making. Under the circumstances, DCF made reasonable efforts to reunify L.N. and Mariah, but L.N. was unable or unwilling to benefit from these efforts.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus September 15, 1999, the date when the petition was amended.
DCF has alleged the grounds of failure to rehabilitate, lack of an ongoing parent-child relationship, and acts of omission or commission. The court finds that DCF has proven failure to rehabilitate and lack of an going parent-child relationship against the mother by clear and convincing evidence.
1. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a- 112(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to CT Page 14704 the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In re Hector L.,53 Conn. App. 359, 366-67 (1999). Because of the requirement that the court predict what will happen within a reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it. Here, seven months elapsed between the filing of the termination petition in March, 1999 and the start of trial in October, 1999, which is a reasonable time, especially given the age of the child.
As the Appellate court recently noted in In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether L.N. was better able to be a parent to Mariah when the petition was filed than at the time of her commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed in March, 1999, one year after the neglect adjudication in March, 1998.[7]
The evidence is clear and convincing that L.N. is not able to be a parent to Mariah and that she could not become able to do so within a reasonable time.
L.N. argues that DCF wrote her off. Examples cited include the alleged failure to offer her adequate visitation (which the court addressed above), and the alleged failure to involve her guardian in reviewing the court-ordered Expectations. She asserts that DCF had an extra duty to her because she herself was a child when she became a parent. She is critical of the foster grandmother for "interfering" with the "bond" between L.N. and Mariah.
She also argues that she has grown, through counseling, and that she is sufficiently mature now to be a parent for Mariah. Now, she claims, she has a good plan in place for Mariah.
Based on the foregoing factual discussion and findings, the court finds these arguments unpersuasive. DCF met its obligation to assist L.N. with rehabilitation. The court already has addressed visitation, which was one of the key goals set for L. N. and Mariah and as to which L.N. failed to fulfill her CT Page 14705 parental duty. She also failed to engage in any counseling at all after the June, 1996 recommendation, after the 1997 service agreement, and after the 1998 court-ordered Expectations. She did not begin counseling until January, 1999, well after she was advised Mariah was being placed in a pre-adoptive home in July, 1998 and after she had become a stranger to Mariah. The counseling has been substantially limited to helping her through her legal and medical problems. It has not delved into her past or dealt with Mariah in any meaningful way. As the court has noted, L.N. was not completely candid with her counselor.
In essence, for an extended period of time, L.N. put her own needs first, and those of Mariah second. She would not go to counseling and she would not see Mariah. She did obtain various jobs, she did participate in teen mentoring, and she stayed away from drugs and the criminal justice system. But she did not begin to address the two key elements, counseling and regular visitation, until January, 1999.
At the same time, J.N., her guardian, was well aware of what L.N. needed to do, as were her guardian ad litem and her attorney. J.N. had signed the Services Agreement in 1997. It is evident that she had little influence over L.N. She made a less than credible witness. The court rejects the contention that if DCF had been more involved in contacting J.N. it would have made any difference in L.N.'s willingness or ability to address the issues. J.N., and L.N.'s other advisors, could not make L.N. do what was necessary. She was either incapable of doing so or unwilling to do so.
While L.N. did not maintain consistent interest in Mariah, her needs necessarily were met by M.P., by Beth, and by their extended family. Surely, M.P. did not prevent L.N. from establishing a relationship with Mariah; L.N.'s own witness, Ms. Murphy, said M.P. was friendly and welcoming.
Dr. Martinez and Dr. Rosado observed five separate interactions between Mariah and L.N., starting in March, 1999 and in the months leading up to the trial. Mariah consistently exhibited anxiety and vigilance toward L.N. She refused to be in the same room with L.N. without the nearby presence of her foster grandmother.
Mariah is a bright, imaginative four year old. She needs direction and stimulation. L.N. was observed by both Dr. CT Page 14706 Martinez and Dr. Rosado to have no real relationship with Mariah. Significant limitations in her abilities to be able to provide direction and stimulation to Mariah were reported by Dr. Martinez.[8] Dr. Rosado commented on his doubts about whether L.N.'s parental expectations were realistic.
As noted above, the key is the ability to be a parent to this child. The law sees the child as an individual, whose age and needs are to be uniquely considered. L.N. has shown that she has little real idea as to how to be a parent to Mariah. Mariah has shown an active resistance to being alone with her. Mariah is a member of M.P.'s and Beth's family and is bonded to them.
In addition, there remains well-founded doubt as to the extent to which L.N. may sustain her current interest in Mariah to the point of continuing to personally progress. The court finds that L.N. cannot assume a responsible position in Mariah's life now. L.N. has had a more than reasonable time to establish a significant relationship with Mariah. The court also finds that there is no reason to believe that she will be able to do so within a reasonable time in the future.
2. No On-going Relationship
DCF also alleges that there is no ongoing parent-child relationship between L.N. and Mariah. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D). This ground encompasses a situation in which regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re JuvenileAppeal (Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T., 51 Conn. App. 595, 602
(1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id. In In re Romance M., 229 Conn. 345,355 (1994), the Supreme Court noted the distinction between a CT Page 14707 psychological parent and a" `a person who visits.'"
Here, based on the foregoing findings and discussion, there is no doubt that the required relationship between L.N. and Mariah is absent. She is anxious and vigilant concerning L.N. When her foster grandmother tried to leave one observed interaction, Mariah attempted to bar the door to prevent her. Both Dr. Martinez and Dr. Rosado believe there is no attachment relationship between them. Mariah tolerates playing with L.N. and will display affection, if her foster grandmother is present. She played nicely with Dr. Rosado too, although she was not familiar with him. Mariah's feelings are unambiguous. She is bonded to Beth and M.P., who, to her, are members of her real family. In her eyes, they are her true mother and true grandmother. They have met, on a day to day basis, her physical, emotional, moral and educational needs. After all, they have cared for her for almost all of her life.
In contrast, it is unclear whether L.N. ever was Mariah's primary caretaker in the first few months of her life. Several other caretakers were involved.
In considering whether to allow further time for the establishment of a parent-child relationship, the court notes the testimony of Dr. Mantell and Dr. Martinez as to the critical need for permanence in the life of a four year old who has been in foster care over three-and-one-half years. Dr. Mantell observed that continuity of attachment is critical. "Time is of the essence" for such a child. Dr. Martinez provided similar opinions after her observations of L.N. and Mariah. The court credits her view that it is in Mariah's best interest to be adopted by Beth.
Marish may benefit later in life from having some contact with L.N., her biological mother. But there is no reason to place her in limbo for some indeterminate time while L.N. continues to work at trying to make Mariah relate to her other than as a person who visits.
Three and a half years is more than enough time for the establishment of a significant relationship. Even after L.N. started visiting again regularly in January, 1999, through the evaluations in October, 1999, Mariah still views L.N. with guardedness. To keep on with such efforts for some other indefinite period in order to allow L.N. to try to become a parent to Mariah would only be confusing and disruptive to her CT Page 14708 development. It would be patently unfair to Mariah.
Based on clear and convincing evidence, there is no ongoing relationship between L.N. and Mariah. To allow further time for one to develop would be detrimental to her best interest.
3. Acts of Commission or Omission
DCF also alleges that L.N.'s parental rights should be terminated, pursuant to Conn. Gen. Stat. § 17a-112 (c)(3), claiming that, "by reason of an act or acts of parental commission or omission" Mariah has been denied "the care, guidance or control necessary for her physical, educational or emotional well-being." Motion to Amend Petition, at 1. The bases for this claim are that Mariah has not lived with L.N. since March 1, 1996 and that in the months Mariah spent with L.N. she made inappropriate child care arrangements necessitating Mariah's removal. Id. at 1-2. Subsequent to that removal, petitioner alleges, L.N. did not comply with the 1997 Service Agreement and the 1998 court Expectations. DCF does not allege that Mariah has suffered physical or emotional injury as a result of L.N.'s acts of commission or omission.
In order to sustain its burden under this ground for termination, DCF must demonstrate that the child has been injured in some way as a result of the alleged acts of commission or omission. In re Lauren R., 49 Conn. App. 763, 773 (1998); In reKelly S., 29 Conn. App. 600, 616 (1992) ("requires proof of specific conduct that has caused serious injury to the child");In re Jeffrey T., 1998 Ct. Sup. 1100, 1105 (January 27, 1998). Since DCF has failed to allege or prove that Mariah suffered either physical or emotional injury as a result of L.N.'s acts or failures to act, this ground for termination has not been proved.
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The Appellate Court has "consistently held that to allow a CT Page 14709 child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997). Three and a half years in foster care is more than enough for Mariah. Based on the foregoing findings and discussion, the court finds, by clear and convincing evidence, that termination of L.N.'s parental rights is in Mariah's best interest. She needs and is entitled to permanency and stability in order to continue to properly develop. If L.N.'s parental rights were allowed to continue and if Mariah's familial attachment to Beth and M.P. were disrupted, it would cause significant emotional damage to Mariah. To permit this would be ignoring her as a person, as well the relationships established with those who have cared for her for almost all her life. Since "time is of the essence," the evidence is clear and convincing that L.N.'s parental rights must come to an end.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (d). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. Based on the foregoing discussion, the court finds that DCF provided foster care for Mariah and offered L.N. services and visitation. These services were relevant to the needs of the mother.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation, but that there was no reasonable possibility of reunification as a result of L.N.'s failure to visit regularly and failure to utilize services.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On March 18, 1998, at the time of the neglect adjudication, the court entered Expectations (Exh. 5) concerning L.N. These included: (1) keep all appointments with DCF and keep whereabouts CT Page 14710 known to DCF or her attorney; (2) visit Mariah as often as DCF permits; (3) participate in counseling; (4) secure adequate housing and income; (5) no substance abuse; (6) obtain consistent secondary caretaker who will meet with DCF worker and pass a background check; (7) no involvement with criminal justice system; (8) participate in teen mentor program; and (9) complete psychological evaluation and follow recommendations.
Based on the foregoing discussion, the court finds that L.N. did keep her whereabouts known. However, she did not attend case reviews held by DCF on July 14, 1998 and January 12, 1999 concerning planning for Mariah. Exh. 1 at 11. She did not visit Mariah as often as permitted; as discussed, there were significant lapses in visitation. She did not participate in counseling until January, 1999. She did secure adequate housing, she obtained employment, and she did not engage in substance abuse. No consistent secondary caretaker was identified prior to the filing of the petition. At trial, she proposed that alternate caretakers would include her grandmother, her mentor and the nursery school where she recently began to work. She was not involved with the criminal justice system. She did participate in the teen mentor program. She did not complete the psychological evaluation. She was not evaluated again until she was seen by Dr. Mantell and Dr. Rosado as trial approached.
DCF provided casework, offered counseling, and psychiatric and psychological evaluations, facilitated visitation, and provided referrals.
4) The feelings and emotional ties of the child with respect to her parents, any guardian of her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Mariah has expressed the desire that L.N. not visit her. Mariah has no emotional ties to L.N. She is apprehensive and guarded concerning her. She declines to be alone in her presence. She is securely attached and bonded to her foster mother and foster grandmother.
5) The age of the child
Mariah is presently four years old.
CT Page 14711 6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that L.N. has not made reasonable efforts to adjust her circumstances or conditions to make it in Mariah's best interests to return home in the foreseeable future. For a period of years, from March 1996 until January, 1999, L.N. declined to visit on a regular basis and refused to engage in any counseling. By that point, the opportunity to develop a significant relationship with Mariah was lost.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent. L.N. did not face unreasonable interference from J.S., from any third persons, or from economic circumstances. L.N.'s predicament is a consequence of her own actions and her own failure to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Mariah for a termination of parental rights to enter with respect to the mother, L.N., and the father, J.S. Accordingly, the court hereby grants the petition to terminate the parental rights of L.N. and J.S. The court further orders that the Commissioner of DCF is appointed statutory parent for Mariah for the purpose of securing an adoptive family. If the foster mother is willing to adopt, it is the court's direction that she receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered. CT Page 14712
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT